17-009-77, Mass Commons, LLC, and a number of other limited liability companies, thank you for including me. The Illinois Department of Agriculture has five dependent accountants. Partnering on behalf of Dependent Accountants, David Gattel, Mr. William F. Morehead, and Clare. Partnering on behalf of Dependent Accountants, Illinois Department of Agriculture, Ms. Bridget, and David Keechler. Partnering on behalf of Dependent Accountants, City of Aurora, Mr. John Caldwell. Partnering on behalf of Dependent Accountants, Illinois Department of Agriculture, Ms. Melissa A. Martin-Petco. Good morning, all. We accept some additional time because we wanted to hear from all of you without cutting each other off. If you don't need that time, certainly you don't need to take it, but we would like you to stay within those time limits. But for a question we might have pending, we'll let you certainly finish your answer. All right, so we'll begin with Mr. – well, is it Mr. – who wants to go first, Mr. Moran or Ms. – okay, Mr. Moran. Thank you, Your Honor. May it please the court, counsel. As Mr. Matsko said, my name is Bill Moran, Springfield, Illinois. I'm here on behalf of Curative Health, a private defendant in this case. This is a case – a very interesting case of first impression concerning the compassionate use of medical cannabis pilot program act. It's such a case of first impression that we really don't even know what pilot program means. We searched the law, can't find anything that tells us whether there's a different standard when the legislature passes a pilot program or even why they call this a pilot program. That being said, this is a case that's going to have far-reaching implications. The act provides that each of the 22 ISP districts, Illinois State Police Districts in the state of Illinois, get a cultivation center. If you look at the department's website, you'll see that there's 21 of those cultivation centers that were set and cited pursuant to these rules. There's not a 22nd cultivation center because I just found out that the 22nd district is the tollway authority, and the legislature apparently didn't want the tollway authority to have a cultivation center. That being said, we've argued a number of issues from the trial court, but make no mistake, the 25-foot setback question is the primary focus of this appeal. 2,500? 2,500, sorry. It's the focus of this appeal. What I've done is if you look at the trial court's decision, there are seven main points, basically, that go all the way from the standard of review to the points that we argue give cause to the appellate court to reverse the trial court's decision. As far as standard of review is concerned, the trial court recognized that as an administrative agency, and this is a quote, the IBOA is to be given significant and substantial deference in its rulemaking and interpretation of the rules. Based upon this appeal, I suspect you feel that the appropriate deference wasn't given. Is that correct? Without a doubt, Your Honor, and that's one of the main issues we want to make in this case. And would you please proceed with that one? If you look at the trial court, we look at the standard of review as a mixed question of fact and law. Where that came from was that we have the act, we have the department's rules, we have Aurora's zoning ordinances that we looked at. That's the law. What we thought the facts were, which we believe that the courts have to consider in this case, are the different special, accessory, and limited uses that Aurora allows in the two residential districts, R1 and R5, that are of interest here. In our briefs before the appellate court, we agreed, and I have to give the state credit for this, that they started the recognition that this is really a de novo review kind of case for the appellate court because there's really not a dispute about the facts. If you look at the standard of review in this court's case law, we point to the Portman case where the court held, moreover, we again note that we are to give an administrative agency's interpretation of its own regulations deference unless it is clearly erroneous, arbitrary, unreasonable, or inconsistent with past interpretations. This deference is given on the basis that the administrative agency charged with the administration of a statute is able to make informed judgments on the issues because of its experience and expertise. You would agree that the administrative agency cannot extend or alter the operation of a statute, correct? Without a doubt, that's true. But in this case, that didn't happen. If you look at the way the legislature set up the act, the first part is which patients qualified for the act. They gave that to the Department of Public Health because it has experience in determining whether people are medically qualified for things. You look at dispensaries. Dispensaries were given to the Department of Professional Regulation. Professional Regulation regulates pharmacists and pharmacies. That's essentially what a dispensary is. You look at cultivation centers, and cultivation centers, all they really are is a plant growing operation where you have seed, soil, fertilizer, water, and sunlight. The Department of Agriculture certainly would know about plants, but what does the Department of Agriculture know about zoning and areas zoned for residential use? Well, they have a lot of experience with setbacks, and as we stated in our brief, if you look at the Livestock Management Facility Act, which is these mega hog farms and cattle farms, they all have setback requirements. They administer those setback requirements. And if you've ever had one of those cases come through here, you understand that those setback requirements are very, very important in those cases, so they do have experience looking at those things, and that shows that the legislature here did the right thing and assigned this to the right department because they do have experience, so deference should be given to their determination. The trial court in this case held that the regulation did not alter, impermissibly alter the statute, correct? That's correct. And then the trial court also made a comment in its ruling that Medponics did not really contest it. That's correct. Do you agree with that? I do, Your Honor. In response to that, I'll point out a couple of things. They clearly did not state that the rule exceeded or limited the authority under the statute. Therefore, it's waived. That's an easy argument. This court deals with it all the time. Even if it's not found to be waived, they haven't cited any authority that says that in an administrative review proceeding, we can give up on an issue at the trial court, not argue it, not have a determination of it, and then come in from the appellate court and backdoor it, in fact, and have that issue decided. Well, how did the Department of Agriculture arrive at its definition of use for residential use? No, Your Honor, there's not a lot of legislative history in this instance about why that happened. I think to answer that question, what you have to do is kind of look at the state of Illinois as kind of a big picture and see that these state police districts go from South Beloit all the way down to Cairo and from Quincy to Danville. If you look at all those areas, there's some of those areas that are entirely rural where there's farms. And as we know, where there's farmland agriculture in those counties, usually there is no restriction to where housing can be. And in this case, the interpretation of the trial court was essentially that if there's a residence there, in other words, our find, if it says residential, then that controls, the heading controls. We don't look at what the true makeup of that area is, and that's exclusively residential. In this case, that's our point that however they came to determine that it be exclusively residential, that the trial court just blew right past the common sense definition of that word, exclusively. And now we're going to have a case, an Illinois that had a foreign case, that we cite that has that exact definition of exclusively. What residential area are you aware of that has no church or no park, no school, no electric substation? I mean, it seems like you're basically just, I think, exclusively residential when you have an area, it's all houses and there's one park. So now it's not exclusively residential. You could locate a cannabis grill facility right next door to a house, right next door to a house that's part of a subdivision, basically, because there's a park in the subdivision. That's not our situation, Your Honor. If you look at the list, and parks, okay, schools, but if you look at- I mean, what you're asking us to hold here is that exclusively means exclusively, correct? That's correct. And, again, if you look at the case specifics in this instance concerning Aurora, permitted uses in just R1, I'll limit it to, are private households, dwelling units, one family, but also religious institutions. Therefore, a megachurch could be right in the middle of the subdivision where thousands of cars show up every Sunday. But that's not just it here. In Aurora, and, again, Aurora's asking to have a seat at the table in this case to explain this, but if you look at the statute, not only schools, parks, but group homes, transportation services, cab companies, bus companies, air passenger terminals. You could have an airport with planes taking off, with the noise, with the pollution, with the travel in and out of that type of circumstance. Does Aurora have a specific zoning category for, say, an airport or a terminal? I don't believe so, Your Honor, but they do allow them to be in R1 and R5 districts. Another thing that I don't think people have made much of in this case, but this isn't a circumstance where the State of Illinois Department of Agriculture has foisted this cultivation center on the city of Aurora. The first thing is if you look at the map where it is, the cultivation center that my client has is already in an industrial, light industrial manufacturing district that was continuous to the R1 and R5 designations. There were already factories there. We bought a building that had been used as a warehouse that was already in existence next to these neighborhoods. Therefore, there wasn't a circumstance here where, boom, a cultivation center shows up right next to a residence. Aurora, in its ordinance, they approve the special use in this instance specifically found, and I'm going to quote, and I'm going to read this because I think it's important. The proposed special use will not be detrimental to or endanger the public health, safety, morals, comfort, or general welfare, will not be injurious to the use of other property in the immediate vicinity, nor diminish or impair property values in the neighborhood, and further, the city council finds that the granting of this special use will not impede normal and orderly development and improvement of surrounding property for uses permitted in the district, and that adequate utilities, access roads, drainage, and all other facilities are being provided, and that the special use will in all respects conform to the applicable regulations of the M2 manufacturing general zoning classification where this cultivation center is. This is the letter that you had to provide to the administrative agency from the city? No, this is in the ordinance itself, Your Honor, and in this case, again. But you had to provide those things to the administrative agency, the Department of Agriculture? Right, it's required. I misunderstood. As soon as the statute and the rules, you are required to show that you have complied with the local zoning. And here, if you look at what happened in front of Aurora, my client filed an application for special use. It first went to the planning commission who held a public hearing concerning this, listened to the citizens of Aurora, and recommended that this special use be issued. The mayor then went, that recommendation then went to the city council where it was on their agenda, where it was debated, where there was a public vote concerning this ordinance, this special use, and at the end of that process, passed easily at the city of Aurora. And again, that's part of, you know, you rarely have, I'm from Springfield, so you have to excuse me, but you rarely say that, boy, our legislature just got perfectly bright in an instance. But here they did. They said, look, if your community is going to have one of these, we understand that there's going to be concerns. They passed Section 140 of the Act that says you can pass local regulations as long as you don't trickle the act, and you need to consider the Department of Agriculture, and they did in this instance. That's why, if you look at all of the points here that the trial court had, it just substituted its own judgment for the deference that should have been given to the department here. One of the things I want to point out, and I think this is also a point of emphasis, is that the rule that we have issued here was reviewed by JCAR. JCAR is a board that's set up by the legislature to review their rulemaking. If you look at the history of the Act, its initial sponsor, and basically the architect of the Act, was Representative Lulang Fong Skokie. He introduced the legislation, wrote it all the way through, got it passed, got it signed by the government. So you would have to assume that he was pretty well versed in what was included in the Act and what the requirements were and what the legislature thought the intent was. Did he also sit on that separate JCAR? He did. He did. And so, again, while there's not a history of this, common sense would have to tell you that when these rules were submitted to JCAR, the panel that he sat on, if he saw any red flags, he would have raised his hand and said, no, this is not what we intended. That's the exact opposite of what happened. JCAR looked at these rules and passed muster on all of them. They issued a certificate of no objection in this case, and I think that should give the court here a lot of comfort in this instance that what the department did in this case is deserving of deference and that this rule was appropriate under the statute. What does exclusively residential mean? Again, we point out, in North Barrington, we found one example where there is nothing but houses. So we're rest assured that you won't seek a plot near Barrington. My question is, what does that mean for the rest of the state? Again, if you have other districts that are all rural, you can have houses anywhere on farms, and so there may be districts where you wouldn't have any property that would be zoned so it would be far enough away from a residence. If you look at and extrapolate out what the trial court's decision was here, it essentially says because the state labeled this as residential, just look at that label, don't look at what's in the district. It also said that what we're arguing is that there can be no special uses. Again, that's wrong. If you had an area that was residential, and let's say it said the residences were limited to one story or two stories, but if you want to build a three-story house or a four-story apartment building, you have to get a special use. In that circumstance, it would still be residential, but there would be special uses that would be applied in that instance. Again, I understand the need to look at this at the big picture, but if we look at this at the small picture, the trial court decision, this simply doesn't make any sense. Well, let me ask you, if we only had the statute and not the regulation, wouldn't that make sense? Again, when it just says residential... It says area zoned for residential use, clearly R1 and R5 are areas zoned for residential use. And so if any residence was near one of those... No, any area that's zoned for residential use, whether there are other uses or not, if that area is zoned for residential use, playing the language of the statute, the trial court's correct. But again, if you look at the law in relation to this and limiting the scope, the one case everybody seems to go to is the Hadley case. In the Hadley case, we had a statute that provides that indigent inmates don't have to pay the $2 co-pay for non-emergency medical and dental. The Department of Corrections passed a rule that said while these inmates are in the system, we're going to charge their $2... Finish your question. Finish your answer. We're going to charge their trust account that $2, and then when they get out, when they're released, they can apply for an exemption for those costs, and then it will be allowed then. What the Supreme Court said that was an improper limiting, because if you had people that had life sentences or people... It was an older decision, death penalty. They could never qualify for that exemption, and that impermissibly limited that statute. Here, all the Department did was explain what area zone for residential use was, and we would argue that that was what was in their authority. All right, Mr. Murray, I'm going to file that item. We'll only give you about two minutes to talk about confidentiality, but two minutes and you're done. Thank you, Your Honor. Confidentiality... I don't like to use the word no-brainer, but if you look at the statute, just read it on its face. It says, The following information received and records kept by the Department of Agriculture for persons... We already know what the statute says. The issue is how does that interplay with the justice system. We have rules, too, and the rules are everything that's filed in court should be open to the public. So put those two together. We know what the statute says. Again, you have juvenile proceedings, you have mental health proceedings, you have adoption proceedings where those records are sealed. The point was made that the Gaining Act, when it was first filed, had a similar confidentiality provision, which the legislature went back and changed later. In this instance, the legislative intent is so strong that it says, You release this information, you're guilty of a crime. That couldn't make the point any stronger that their intent, at least for the pilot program, was that these applications related to a very unique subject matter, which is illegal, it's still a controlled substance under the federal guidelines, that in that case there is a nexus between what the state's interest is in this case and the confidentiality. Well, indeed, because it is an illegal substance, it is likely, more likely than not, that a court will somehow get involved in a case involving this center, whether it be its application, its administration. Courts don't look at that confidentiality in the same way, apparently, and we have to have generally open records unless a compelling reason can be asserted. And the fact that the statute says, and you could be fined or guilty of a misdemeanor, is generally not a convincing argument. But the courts also like smooth proceedings, and if you look at the record in this case, we spent the most time in this case not arguing about what exclusively means, but what should be in the record and not in the record. We looked over thousands of pages, paragraph by paragraph, in order to determine what should be public and what not. Well, technically, this is an agreed motion, and I'll ask Ms. Murphy the same question about confidentiality when she comes forward. Thank you. You'll have an opportunity for response. Thank you. All right, I assume that the order would be Ms. DeCastro. Good morning. Good morning to the Court. Bridget E. Batista on behalf of the Illinois Department of Agriculture. Your Honors, we ask that the Court reverse the Circuit Court's decision, which overturned the Department's permit award, for two main reasons. First, in adopting Medtronic's proposed interpretation of the regulation at issue, the Circuit Court failed to afford any definition of confidentiality. Second, the Circuit Court's interpretation violates recognized rules of statutory interpretation by rejecting the plain meaning of the regulation, narrowing the scope of its terms, and stressing the general statutory language over the specific regulatory language. Regarding the first point, this Court has repeatedly held that courts owe substantial deference to an agency's construction of its own regulations and will defer to this interpretation unless it is clearly erroneous, unreasonable, or inconsistent with past interpretations. Well, most courts that I've sat on, or my colleagues have, have something to do with a zoning ordinance from time to time, whether it be the denial of something or the permission of something, the neighbors arguing it all involves zoning. These two districts were zoned residential. How, then, did the Department decide residential meant exclusively and didn't use, well, yeah, you do use the word zone, a zone exclusively for residential use? Your Honor, as my co-counselor mentioned, I don't know that there is legislative history to indicate that, but if we look at just from a common sense perspective, we can see that this was added potentially because it would severely restrict the area in which these cultivation centers could be located. And, again, when we look to this regulation, we see the question is can it be read consistently with the statute? If there's not a conflict, if it does not directly conflict with the statute, the court, as the Supreme Court has noted, has a duty to uphold that regulation. Well, Mr. Moran compared it to agricultural districts, and those would be significant south of I-80. But an agricultural district is zoned agricultural. It is not zoned residential, notwithstanding the fact that that might have one, two, five houses on it. So that's very different than zoned residential. And I think, and correct me if I'm wrong, Your Honor, but I think your question might be going to, and I think there's a dispute over the phrase zoned for. Exactly. Yes, Your Honor. And how do you change that? I mean, I get your, you know, it would be unduly restrictive, what's a residential area, et cetera. But both the statute and the rules say zoned for. There's nothing in either that would allow the court or any other entity to go beyond what is zoned. And I think, to me, that's the heart of the question. And we cite in our case, Your Honor, instances where the phrase zoned for is used not simply for the overarching district, which is where R1 and R2, there's no dispute that R1 and R5 are zoned overarchingly as residential. The question is zoned for. That phrase is not used simply for overarching, but it's also used zoned for special uses, zoned for permissive uses. So when we look at those cases and we see that language is used, and, again, we need to look to see can we uphold this regulation. Is this an appropriate interpretation of the statute? We need to make every effort to uphold it. And we see that cases do use that phrase not simply for discussing zoning of residential uses. Because that occurred here, because there was zoning for more than simply residences, it is no longer exclusively zoned for residential use, and for that reason. There is some language in the Aurora Zoning Ordinance about exclusive use when talking about an area versus a district. So why don't you explain that? Yes, Your Honor. And we point out in our brief that R1 and R5, despite the representation made in a public counsel's brief, are not indicated as those residential areas. There's nothing indicating that they, as that term is defined. So the defining terms in the ordinance of residential area and residential area is defined as exclusively residential. But R1 and R5 are not designated as a, quote, residential area. And when we look to what the definition in the city ordinance of residential area, we see that, in fact, the city of Aurora designated those as plots, single plots of land, which does not connote an entire residential district. So for that reason, we would ask that the court reject that argument. Well, we're only concerned, obviously, with this case. But you're saying that specifically we have to, if we're going to look at these, have to look at then what the ordinance is saying, as well as what your regulations and the statute say. You know, we asserted in our brief that we do not look to the city ordinance, we look to the regulation, but we do have an argument that even if this court were to look to the ordinance for guidance on how to interpret the regulation, that this is no issue there. Here, the certified did not explain how the agency's interpretation was clearly erroneous, arbitrary, or unreasonable. Instead, without analysis, it simply stated that the interpretation was, quote, illogical and was not consistent with the purpose of the setback provision. But in rejecting the agency's interpretation, again, it failed to afford the regulation its plain meaning. The regulation limits the setback requirement to areas zoned exclusively for residential use. The court, in its order, held that this phrase did not mean areas, quote, where nothing but residences are permitted. But that is precisely what the language exclusively means. In this way, the circuit court limited the scope of the term exclusively by determining it should not apply to exclude accessory permitted and special uses. This was error. Finally, the court improperly focused on the broader statute. So although the court recognized that no argument had been made that the regulation was in any way invalid, it nevertheless, in its reasoning, was looking to the statute rather than the regulation. If we look at a careful reading of the circuit court's order, it demonstrates that it was moving away from this term exclusively and was speaking only to adhere to the statute. And, again, that was error. And I think once again, well, there is a regulation. We have to acknowledge that. But why can't the trial court, in its review, look to the statutory authority, which came first? Why isn't that controlling? Your Honor, we do cite in our brief a case involving a defined term from the regulation as opposed to a broader statute. And the court, in that instance, were well aware of the statutory canon of the specific control of the general. And in the case, I apologize, I don't have the name, and perhaps on the bottle can notify the court of the name of the case, but that we look to when we have a defined term, which is what the regulation here does, it defines the term. We look to that over the statute. And, again, with respect to invalidating the regulation, Medtom has forfeited this argument. They made no argument on appeal. The circuit court specifically found that Medtom has forfeited the argument with respect to invalidation. And it has made no argument, as is required to do, that the circuit court's finding on this was an abuse of discretion. My opponent also cites the case of Hadley to argue that this regulation was improper. But when we look to the facts of Hadley, we see that the court noted that courts should make every effort to uphold the regulation and not to invalidate it. And, importantly, in that case, again, as my co-counsel mentioned, it was with regard to a copayment by indigent inmates. In that case, the regulation completely conflicted with the statute. That is not what is at issue here. In addition, in Hadley, they said what would have been appropriate, they went to a Massachusetts regulation and they say, in that case, in the Massachusetts regulation, they defined what an indigent inmate was. And that was an individual with an account of less than $10. So in that instance, our Supreme Court blessed that type of definition. It was a broad statute, indigent inmates, and, of course, our Supreme Court stated that narrowing it to define that broad statutory term to mean an individual with an account of less than $10 would have been appropriate. So in our state, it has been recognized that regulations properly may define a broader statutory term, which is what occurred in this instance. Is the regulation on broadening the statute as opposed to narrowing it? Your Honor, that's right. I mean, because if you read the statute in what the trial court did, it severely limits where these go. Yes, Your Honor, and there is some confusion when I say, you know, broadly, but what Your Honor is absolutely correct that the effect of it would be to allow for more areas to qualify for the center. And again, because there has not been a conflict created by this and that these two can be read harmoniously, which is what our Supreme Court has asked that courts do, that should be the path taken as opposed to what the circuit court did here. And I think there was maybe the circuit court was weighing Medtronic's interpretation and the Department's interpretation and finding Medtronic's interpretation to be more reasonable. Even if that's the case, even if this court were to agree that Medtronic's interpretation is a reasonable one, that's insufficient to overturn the Department's award. Rather, it must find that the Department's interpretation was unreasonable and it has not done that here, and for those reasons, unless the court has any further questions, we would ask. Oh, pardon me. Your position is that your definition of residential to mean exclusively residential, you acknowledge that broadens the scope of the statute, but your position is that that does not make it in conflict with the statute. Absolutely, Your Honor. If the statute allows this much space to be used, your regulation allows this much. I think it's more accurate to say that this properly defines the statute, and we also have an argument that when you look to the statute itself, there's these very narrow categories that precede areas zoned for residential use. So in other words, there's group home residence, there's daycare centers, and so if we look at the statutory construction principle, looking at that term in a series of other narrow items that precede it, there is an indication by the legislation that this was not intended to be broadly construed. So it was appropriate for the regulation to explain that, to define what was meant by that legislation. And for those reasons, we would ask that the Court Mr. Walsh. Good morning, Your Honors, and may it please the Court, my name is Al Walsh, and I have the privilege of representing the City of Aurora, the intervener appellant in the matter before you. The City of Aurora sought to intervene in the underlying administrative review matter before the Wake County Circuit Court, and the Circuit Court of Wake County denied Aurora's petition on the grounds that it was untimely, and that the City lacked sufficient interest in proceedings to warrant its intervention. I think the Court, reading the transcript or the record in this case, was more concerned about the timeliness issue, although the other issues played a part. And he was somewhat incredulous that this could be going on for this much time, and Aurora had done nothing thus far. Can you address that? Yes, I certainly can, Your Honor. And I would make a couple of points. First of all, if you look at the record in the case, I noted in my review that there was an initial complaint, a first amended complaint, a second amended complaint filed, and in none of those instances was notice ever provided to the City of Aurora regarding the filings of these multiple complaints. And in fact, Your Honor, when I examined the record that was before the Circuit Court of Wake County, there was no mention of the City of Aurora that I could find. So, in fact, there was, before the judge in the Circuit Court, clear evidence, the record itself, that indicated that the City had received no notice whatsoever of the ongoing litigation. Did you agree that it's the City's burden, though, to show timeliness, to show the ridiculous intervention petition in a timely fashion? Well, I think, Your Honor, my response to that is that there are a line of cases in Illinois that address the issue of the timeliness of the filing of a petition for intervention and the necessity of doing so. And this line of cases indicates that even if a petition is filed after judgment has been entered, if it is necessary that the putative intervener get into the case in order to protect its interests, then that necessity factor... Even without the entitlement. Even if this person had noticed from the beginning of this case all the way through to the judgment and then because their interests are affected, they're allowed to file a petition, even if it's totally untimely. Is that what you're... No, what I'm saying, Your Honor, is that the cases to which I referred the court in Aurora's briefs, interestingly, they indicate that the party-seeking intervention was never aware of the litigation in which it was tried to intervene, and only until after judgment they had affected its interests. That's the question I'm asking. Whose burden is it to show that the city was unaware of this up until after the judgment? I think the city is required to show that it lacked awareness, and I think the city can point to the record that was before the circuit court to indicate that... Let me go to page 20 of the amendment to the transcript that says, the court, so you have no information whatsoever... This is a question just to you. So you have no information whatsoever from the city of Aurora as to when they became aware of this litigation. Your answer, I do not, Your Honor. So you had no information when Aurora became aware of the litigation. I had no information, Your Honor, but again, I would point to the fact that the record itself provides the information that Aurora didn't have awareness because it was never given any notice that the proceedings were taking place. But the fact remains, Aurora had issued a permit to curative some months before. I don't know the exact amount right now as I sit here, and nothing happened on that permit to the best of the record's information, and nothing happened, and nothing happened, and then four days after or five days after a judgment was entered, a ruling was entered subject to an order being entered, somebody from curative policies says, oh, by the way, guess what just happened? Why wasn't Aurora interested in their permit and why it wasn't going forward? Well, Aurora issued to curative a special use permit that allowed curative to locate a medicinal cannabis cultivation center at a specific location within the city. It was a high industrial area. But nothing happened with that permit, it appears. Well, there could be a multitude of reasons why the building out of the cultivation center did not occur within close proximity in time to the granting of the special use permit. That permit provides curative could locate on the specific location. It doesn't say anything specifically about, you know, timing for building out of the center, and there would have been a number of permits that would have been, you know. Cindy of Aurora was aware of the administrative review, I would assume, because you provided, or the city provided documents to the curative for purposes of an administrative record, correct? To go to the administrative hearing, you provided the ordinance, it was passed. I believe that the truth of the matter is that the Cannabis Act required that curative, you know, go through the city of Aurora's processes to acquire a special use permit. Did you give them documents thereafter? The documents, I'm not aware that the city... Isn't that sort of the key to your awareness? Well, the city of Aurora, you know, was not a party to the administrative proceedings. Here's the question. Sure. It's your awareness. Awareness is not notice. Were you aware of it because you were requested to give documents to curative long after the permit was resolved? Your Honor, documents could have been provided to curative for a number of reasons. Okay, but the question is, whenever it could have been or should have been, did you tender documents to curative after the permit was resolved? We've so far not. Okay. And after that, no other documents, no other communications to your knowledge occurred with curative or the department or anybody? That's correct, Your Honor. And, again, the fact that there were no... The city had no notice of the proceedings in the circuit court of Boyd County, I believe, provides the basis for the position that it did not become necessary for the city to seek to enter this litigation until it became aware of the August 24, 2017, order that reversed the granting of the license to curative. Well, what was that specific compelling reason? You said because it was reversed. What about that decision? Right. Your Honor, as has already been discussed in some detail during this argument, the city of Aurora's zoning ordinance with its zoning classifications is clearly an issue here with regard to the city's zoning of residential areas. The city's granting of the special use permit is clearly an exercise of Aurora's authority as a home rule municipality to exercise control over land use within its jurisdiction and at the point where the circuit court of Boyd County entered its order. Effectively, that order nullified the city of Aurora's finding that locating the center at the site it had been designated was in no way against the interests of the community and was in keeping with the city's zoning ordinance. So at that point, when the order was issued, in effect, the city of Aurora's ability to exercise its control over property within its jurisdiction was rolled back. Exercising control is one thing, but realistically, if the main issue here is a statutory construction analysis between the statute and the regulation, what does Aurora have to add to that? I mean, realistically. Well, for one thing, Aurora has, to add to this, its understanding of how it interprets these zoning classifications within its zoning ordinance, and as the agency who is interpreting and implementing its zoning ordinance, it's entitled to deference that I think requires that it should... Wait, wait, wait. We're supposed to give deference to the city of Aurora? To the degree that it has promulgated its zoning ordinance and engages in the implementation of that ordinance, I believe so. You have an opportunity to respond, if appropriate, at a later time. Ms. Murphy. Good morning, Your Honors. I may have pleased the court. Melissa Murphy-Petros for the plaintiff's affiliate, Ben Pottet. I think it would probably be easier if I take things one at a time. So I'll start with the main issue here, which is the regulation and the interplay between the regulation and the statute. The first thing I would like to point out is that MedPonics is not seeking an appeal to invalidate the regulation. We are not arguing, and have never argued, that the regulation itself is invalid. Our point is that the department's interpretation of the regulation is illogical. If the department and curative are correct, that zoned exclusively for residential use means zoned for residential use with no special permits allowed, then the Act's location requirement for cultivation and growing centers does not apply to every municipality throughout the state. It would only apply to certain municipalities, such as, I guess, the village of North Farrington. There is nothing in the Act that suggests that the legislature intended to limit the location requirement for cultivation and growing centers in this way. So the department's interpretation is, in fact, clearly erroneous. The department's regulation was approved with this provision by a separate body assigned by the legislature to keep an eye on their legislation and to look at the regulations propounded as a result of that legislation. So now we have two layers of legislative review. How do we disregard that? Again, we are not arguing that this regulation is invalid. And I think that's the point. Essentially, if we agree with you, we are saying that, aren't we? That it's not just that it's illogical. It cannot be used. I'm sorry. It can be used. There are areas that are zoned exclusively residential. The fact that special permits may be allowed in an exclusively residentially zoned area does not change that zoning classification. So that's the one we just say with the headings. We just say, if it says R5, it's residential, that's it. We don't look further. Is that your position? That is our position. Because, well, if you look further, as the Department of Interior Department needs to do, and say, well, only if no special use permits are allowed, then, again, we are restricting the act's cultivation growth center location requirement. Then, apparently, it would only apply in those areas, such as North Barrington, where special use permits are not allowed in residentially zoned areas. There's nothing in the act that indicates the legislative intent was to have this particular provision apply to some municipalities in the state, but not to all. And that's why the interpretation of the statute is illogical, and it is clearly erroneous. So, basically, you're saying it's clearly erroneous or unreasonable that the department is saying that the word exclusively means exclusively. The department's interpretation of the word exclusively as saying exclusively but no special permits. Again, I think Justice Jorgenson got right to the point. You have to look at the zoning designation and what it's titled. If it's titled residential, that is exclusively residential. The fact that special use permits may be allowed for parks or churches, what have you, does not change the zoning designation from residential kind of to something else. The zoning designation is residential. Excuse me. It is exclusively residential. Special use permits don't change that. And we have a case decided from the Supreme Court in our brief to that. You would agree that if we disagree with you and find that that's a reasonable reading, that exclusively means exclusively, and that's a reasonable reading, that we have to give deference. Even though it's the normal review, we have to give deference to the department. Well, I agree with that. That's the standard that you're applying in an administrative review proceeding, yes. Obviously disagree that exclusively means what they're saying. One point I would also like to point out, too, just to correct the record, this is nothing that we waived or sat on. We are responding to Kira's argument at pages 32 and 33 of its brief that pointed to the village of and this is the type of municipal area that the act should apply to, and a village that has residential districts with no special use permits involved. So this is clearly a response to their argument on appeal and not something that we've waived or forfeited in the proceedings below as was contended by our adversaries. I think the same point holds true for the department's argument regarding the words areas and districts in looking at the Aurora zoning ordinance that discusses residential districts and residential areas. Again, we would have the same result. If the rule is interpreted so as to only apply to those municipalities that use the word area versus district in their zoning ordinances, then the reality is going to be that the application requirement will not apply throughout the state. And again, there's simply nothing in the legislation that indicates any intent for it to apply to less than all of the municipalities in the state of Illinois. Well, in that regard, looking at a lot of municipalities, as we do here, and we have them coming in on a regular basis on appeal, almost every R district that we see has other uses. They may have to be specially permitted, as was the case in Aurora, but it's hard to find something, as you would define exclusive, to cite one of these. It's just from our experience in looking at zoning ordinances. And I think that what you're saying actually establishes our point. Yes, our zoning districts very often have special use permits. I'm sure you've seen more of them than I have. Most of them probably do have special use permits allowed. That does not change the zoning designation of those districts from something other than exclusively residential. Again, the special use permit doesn't change the zoning category. It's an exception to what else is going on in the zoning category. That's different than, for example, a zoning district such as the one I live in. I live in downtown Elmhurst. So where I live in zones, it's a mixed-use zoning of residential and business altogether. That's not an exclusively residential area. Just the ones that we have in issue here. If we just looked at the label, as you discussed with Justice Jergenson, would we be concerned about that in a cultivation center, if we looked at the label of that district? Of a mixed-use district? Right. I think that you would have to look at the other factors. But at its uses of the property. Right, at other uses of the property. Just like we would with our 1 and our 5. Correct? Yes. Yes, that is correct. But again, as we've been arguing, we cannot have an interpretation that limits the application of the act's growth center location requirement to some but not all municipalities. It's labeled residential only. It is exclusively residential. And the growth center has to be more than 2,500 feet away from it. I will turn next. I'm sorry. Did you have any other questions you wanted to discuss with respect to the regulation? I think not. Okay. That's fine. I will then turn to confidentiality that Your Honor had raised with curative counsel. As we discussed in our brief, we believe that the circuit court, in order of sealing some but not all of the application materials, struck the correct balance between protecting curative's interest as well as having open access to the court. But originally, you had requested in the motion with curative that the record be sealed. Correct? We did. And then we were able to later reach a compromise. The compromise wasn't necessarily with curative. The compromise was with the court. Well, of course. Of course it was. But at the end of the day, it's now our position that the order that the court reached did strike the appropriate balance between confidentiality and between open access of records. In the administrative process, can anybody walk in and get a copy of that record? They can get the parts that are not sealed. In Springfield? Walking into the Department of Agriculture. And I will ask this also in the Statista. But can anybody walk in and look at that administrative record? You know, I'd have to be honest with you and say that I would presume so to the extent that it's not sealed. But I don't know that for certain. Well, here's the point. It's confidential. From the statute, we started. It's confidential. Now, there's hearings before the departments. And you don't know whether or not the records remain confidential at that point. There are hearings under the statute. Are the records available to anyone, or do they remain confidential at that level? I don't know. I would assume at that level that they do remain confidential until a decision has been made. And then, if that decision is challenged in administrative review. If it's challenged. If it doesn't remain challenged. So, if I wanted to get your records, I'd have to file a petition for administrative review. That opens the door to all of the records that I otherwise would not have been able to review. Is that correct? I'm sorry. I'm just thinking. They're confidential at the level of the department. Correct? Yeah. They make a decision. Everything still remains confidential, obviously, except their decision. Now, if I want to see those records, my option is to simply file a petition for review. At which point, I have access to the records. You would have access to the records. Yes. As you would in any litigation. But within the context of the administrative review, the records can still remain sealed. This is not, you know, they're not always going to be available to the general public. Sure. As soon as they're filed, right, under the Circuit Clerk's Act, there becomes a presumption of the right to access. There is. And they can also be filed under seal so that only the parties have access to them. Right. But your position now is that it is more appropriate for the court to pick and choose, delete and not delete, black out, whatever. And only part of it being made available to the public. So I guess I'm trying to really articulate what is your position and what's the takeaway rule? Our position is, yes, that in the context of the statute, the circuit court should take an item-by-item look at these things. And that here, that was appropriately done. As counsel, I believe the procurator mentioned earlier this morning, marijuana is something that, other than the statute, is still illegal in the state of Illinois. There are public concerns with respect to where growing centers may be located, where dispensaries may be located. Having access and transparency in these proceedings is absolutely in the public interest. For the public and the communities where these facilities may be. But there's no transparency. Especially, there's no transparency until you come to court. So whatever the department does, it's not open to the public. There's no transparency. Nothing is disclosed. It's only if two parties are going to complain about what it was that the department decided. And so I guess, you know, globally, how do we balance that apparent conflict? I mean, respectfully, and I didn't shoot the message in her foot. You're arguing transparency and the public's right to know, et cetera, et cetera. None of that comes into play until and unless someone challenges it in court. So the majority of this stuff is done behind, you know, the opposite of transparency is in the back room. In a closed proceeding where all the records are confidential. How do we balance what the legislature has said? You can't even forward this stuff. But yet, when it comes to court, it's all open. Or subject to being just, you know, personal information taken. How do I balance that? I think that we balance it in favor of transparency. In favor of transparency at all levels. This is a very important issue with now discussion of recreational legalization of recreational marijuana, potentially on the horizon now. I think that transparency at all levels benefits everyone. And it is at all levels. Oh, I agree. I agree with what you're saying. My preference would be that it would be transparent at all levels. Not only for those who are seeking these permits, but, again, for members of the community, for taxpayers, areas where they're going to be located, whether they be growing centers or dispensaries. The public certainly has an interest in knowing the qualifications and the expertise of the businesses that are going to be operating these either growing centers or dispensaries in their community. But there may be things that the legislature thought that the public should not be aware of, you know, such as trade secrets and things of that nature. Realistically here, other than the filing of the suit and these papers that were filed with the suit, I mean, the trial court conducted its proceedings here in the same manner and order of whether we call them confidential. The trial court looked at everything, sorted through what should be sealed and what should be released. And that's what the trial – if everything had been – I guess the best practice, because the statute calls it confidential, is to file under seal and then let the court decide as it did here. Yes. But ultimately the court decided here what it would have done otherwise, and in camera inspection, release some, keep some sealed. Yes, exactly. And in terms of such things as trade secrets, which probably is what was motivating the legislature, unfortunately there's not a lot of legislative history available, very minimal, if any, on this particular act. That was, I'm certain, a very motivating concern there. Well, it's a pilot program, which means that the legislature can look back on the pilot and see what should be changed. Yes. And determine what things have changed. And trade secrets can always be protected, as they are routinely in all kinds of proceedings. Finally, with respect to Aurora's petition for leave to intervene, as we said on our brief, it was Aurora's burden to demonstrate the timeliness of that petition. That was the ground on which the circuit court denied the petition. That was not a use of discretion to do so. Aurora was not able to establish with affidavits or any other kind of evidence when it became aware of this action, why it waited until as long as it did to intervene. Well, what is as long as it did? From the time the decision was public until that August 22nd or 24th date in 2017, how much time did it last? That was the August 24th is the date of the circuit court's decision. They filed their petition for leave to intervene on September 12th. I know, but prior to that. Prior to that, 21 months. I'm sorry. Yes, 21 months from the time of the filing of the initial complaint to the circuit court's decision of August 24th. There's also a time when the IDOA had time to review all of the applications for this district and do their scoring. Of course. How long was your application? Do you remember? I do not. Was it more than a month? In the record, I'm certain it was more than a month. I'm certain this was a long and careful process. Yes. Did you ever take any steps to put City of Aurora on notice? We did not serve them with a complaint. They're not a party to the action. Again, I don't think there was any obligation on our part to do so. The City of Aurora issued a permit for this facility, and for at least the 21 months between the time of the filing of our complaint and the circuit court's order, nothing was going on at that site. It seems very odd to me to think that no one in the City of Aurora knew that no construction was going on at the site, that this permit was not being acted upon. The record indicates, as Justice Berg pointed out, that curative actually sought documents from the City of Aurora within the context of this administrative review. None of that ever sparked a question in the City's mind as to what was going on and perhaps whether they believed they needed to intervene. It was, again, the City's burden to establish timeliness. Mr. Wall's statements to the circuit court below were frank acknowledgments that there is no evidence as to when the City learned of this, why it waited until it did file its petition to intervene. And finally, just to wrap that up, even on the merits, I don't know, as Justice Berg was asking, what the City of Aurora would have to add to this. One of the things, since I asked the question, earlier in your argument, you talked about the difference between zoning areas and zoning districts in the Aurora zoning ordinance. The City may have something to add to that. I suppose the City could certainly want to chime in on that. I don't see that their argument on that point would be any different than what the Department has argued, which is that districts and areas are not the same, which, again, then brings us back to limiting the scope of the location requirements. There might be some insight into why that the Department doesn't necessarily have, unless the Department talked to every municipality in the state to find out why they did what they did. Aurora would have had a chance to explain why this district was designated as such, correct? That's true. And if Aurora wanted to avail itself of the opportunity to do that, it was incumbent upon Aurora to timely file a petition for leave to intervene. And Aurora simply did not do that. That was its burden, and it was an abuse of discretion standard. The District Court certainly did not abuse its discretion in denying a petition on the basis of untimeliness. Aren't we putting Aurora in a position where it has to prove a negative? Like, it's my burden to show I didn't know, as opposed to, more normally, it is your burden of proof to show an affirmative thing or event. Isn't your interpretation putting them in a position where they have to prove absence of awareness, which inherently would be somewhat circumstantial, et cetera? I mean, there's no smoking gun. You can't go through and say, oh, here's my diary for the last 21 months. At no time is medconics or curative on my radar. No, with all due respect. Our position is that Aurora needs to have evidence to identify when it learned of this administrative review proceeding and back that up with evidence. They have never been able to say, even if that would be, you know, for example, as an administrator, I drove down the street and I didn't see anything going on, so I went back to my office and made phone calls. That would be something they have to say when they learned of this administrative review proceeding, affirmatively state that. And they have never been able to do that, other than to say, you know, sometime after the order. But then the district court questioned counsel on that point. Did you learn about it the day of the order? Did you learn about it the day after the order? You know, trying to even giving them the opportunity to, again, give a specific piece of information that should not be that difficult for them to come up with. So curative counsel indicated that he thought about it over the weekend, and I don't think he even called on Monday, but maybe called early Tuesday, so that he gave the date. He gave that date, yes, but then he also told the circuit court that he was only referring to that specific order and not to the administrative review proceeding. And again, it was Aurora's burden to establish when it learned of the administrative review proceeding, the action, not when it learned of the final order entered in the action. And that they have not done. All right. There's one last issue that I would like to talk about. And your complaint asks that the applications for the other entities that had filed be sent back for a re-scoring or review of scoring before an impartial panel, one that had nothing to do with this case. Then on appeal, there is an argument in your brief that indicates that only MedPonic should be re-scored or re-evaluated. My first question is, did you file a cross-appeal? We did not. Why not? I noticed the cross-appeal was not necessary because under this court's authorities in Anderson v. Potter and Stratton v. Price, we are asking that the judgment be affirmed. We are not asking that the judgment be reversed and that the re-scoring finding was simply that, a finding. At the time that we filed our complaint, we certainly anticipated that other of the applicants would join in or file their own proceedings. By the end of the day, they did not. And MedPonic is the only entity left that exhausted its administrative remedies. And so it's the only entity that should be re-scored. But that would be a significant issue with the trial court's judgment because according to my reading, the trial court did what MedPonic asked at the trial court level. And now MedPonic is asking for something else. We are asking, again, in this court, we are asking alternatively that we be the only entity re-scored. Which would be a reversal of the trial court's order. No. In our opinion, that would be a reversal of a finding but not the order itself. The order itself is still affirmed. And as I was about to say, that is an alternative request that we have made on appeal. Clearly, affirmance here, we believe, is warranted for all the reasons the trial court set out. And that's what we request. Thank you. Thank you. Mr. Moran, this time I might not even let you finish answering your questions. So, be kind to me. Thank you, Your Honor. First, I know you said, Justice Jorgensen, that you were going to ask the State Act. So, I'm going to hit on the confidentiality question. The provision in question says 145A, the following information received in records kept by the Department of Agriculture for the purpose of administering this Act are subject to all applicable federal privacy laws, confidentiality, and exempt from the Freedom of Information Act. And not subject to disclosure to any individual or public or private entity except as necessary for the authorized employees of these authorized agencies to perform official duties under the Act. So, you walk in Springfield in the Department of Ag, you ask for a copy of anybody's application, you hand them a FOIA request, they say no. What happened in this case is going right to your question is, in this case, the fifth place applicant. And you have to recognize that my client got 84.5% of all available points in this instance. My client got 64.5%. Not even a close race, but by filing, administrators knew they got access to our entire thousands of pages application, which they could use the next time a license comes up and there's an application process. Let's even take it further. Let's say the eighth place applicant filed one piece of paper and said, please give us the permit signed AgroGro. They come in last. They can still file an administrative review and then come in and get access to all of these records. This case, this case right here, was filed in 2015. The issues have been out there for a while. If the legislature thought that there was a problem with this, they could have done something with their statute. But again, their intent was very clear. This is a pilot program. They can change it in the future. If they think that's a problem with the courts, that's something that their prerogative they can do. In relation to the 2,500 foot setback question, if you look at this record, one of the questions I think you have to ask in reviewing this issue is, what is the purpose of this setback? What's the purpose of the act? If you look at the act itself, the purpose it says is to protect these patients who have debilitating diseases and allow them to use these drugs which may help them. That's the purpose of the act itself. If you look in other places of the act, section 165C8 relating to rulemaking says, the Department of Agriculture rules shall address but not be limited to the following related to registered cultivation centers with the goal of protecting against diversion and theft. That's one of the things that the legislature was worried about without imposing an undue burden on registered cultivation centers. Again, they wanted to be business friendly in this case. If you look further, for instance, if you look at section 140 of the act, which gives cities, municipalities, zoning districts the option to adopt their own ordinances, but also the requirement that proof that the local municipality has approved this, is okay, is cool with this happening in their jurisdiction, that has to be filed as part of an application. But that's not the positive of their decision, correct? Exactly. It would be important, but it's just on that basis that would not solve the problem. And I'm saying that it's part of the puzzle. It's one of the pieces to put in there that I think you have to look at in this case. Again, this has been out there since 2015. The legislature has met at least three times and could have amended the act if they thought there was a real problem with this, if they thought that the Department of Agriculture had gone way too far. Their watchdog, Jay Carr, looked at this and didn't send out any red flags. Jay Carr, at that time, again, had the architect of this act. When did Curative actually file its petition with IDOA? Not a month, but a year. Probably would have been 2015 originally. Because there was, if you look, the way that acts and rules are set up, the department would issue a notice that these cultivation centers, our permits are out there, open, and we're accepting applications. And you have a certain amount of time that applied to everybody to submit your applications and then graded them. And in this case, there was eight different applications that were provided in this instance. Again, just in closing, I don't want to take more of the court's time than necessary, but this is an instance, I believe, where the legislation has worked perfectly, that the regulations have protected, again, what's the protection? What's the purpose of the 2,500 foot setback? It's not stated anywhere. Is it to protect against noise? Couldn't be. Is it protected against having a marijuana business buy houses? Well, if you look at the rules, there's no signs allowed. There is no marketplace. There's no clients going in there to purchase the seed. There has to be secure transfers. And most of these buildings are basically looked like warehouses that if you were driven up to one and you have to look at it and say, what is that? You couldn't guess in a million years what was going on inside of it. Therefore, in this case, nothing that has been done by the department or period has violated any purpose that the legislature put out there in this instance. And again, as a pilot program, even if it did, it could be changed. Thank you. Thank you very much. Ms. DiBattista. Thank you, Your Honor. First, I just wanted to cite the case that I had mentioned in my opening with respect to looking to the specific regulatory language, and that's the Monarch Gas Company v. Illinois Commerce Commission, which is cited on page 10 of our brief. I just wanted to underscore a point made by Justice Hutchinson with respect to the client's position that they're not asking the court to disregard the regulation. In fact, to adopt their interpretation does indeed, as Justice Hutchinson mentioned, read out exclusively from the regulation. So in effect, that would be what would occur here, to effectively read out exclusively. That is their interpretation, to disregard the regulation. And in that instance, as Justice Burke mentioned, exclusively remains. The word is there. And Medponex is asking the court to read exclusively as not meaning exclusively. Medponex is saying we don't look further. We look simply at the label. A department's position is we do look further. We look at what it's zoned for. So you have two competing interpretations. Do we owe deference to a dissatisfied party, or do we owe deference to the interpretation of the agency? And when we look to our Supreme Court precedent, we see the courts must make every effort to uphold a regulation if it is not in conflict with the statute. There has been no showing here that this is in conflict with the statute. Rather, this is a highly regulated area that the legislature deems the Department of Agriculture equipped to make rules and regulations with respect to. And for those reasons, we ask that the court defer to that regulation that the legislature delegated that responsibility to the department. Thank you. Thank you. Mr. Wall? Just very briefly, Your Honors, on this issue of timeliness, it's, again, that there was no evidence in the record of any notice to the city regarding the litigation up in Blake County prior to the August 24, 2017, order. And within three weeks after receiving notice that the order had been entered, within three weeks the city filed its petition to intervene prior to the entry of final judgment. And therefore, I would argue, given that it wasn't until after August 24, 2017, that the necessity for the city to get into the case became apparent, and the city then acted promptly to seek to intervene in the case, that it should be found that it did file a timely notice to intervene. Thank you. Well, counsel, thank you very much for, first, your travel from near and far, and secondly, your arguments here this morning. We do appreciate them, and we will take this matter under advisement. We'll issue a decision in due course.